UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ALISON A. ZEA,                        )
                                      )
            Plaintiff,       )    CIVIL ACTION NO.
                                      )    10-11029-DPW
v.                                    )
                                      )
JPMORGAN CHASE BANK, N.A.,   )
and MELIORA HOLDING           )
CORPORATION,                          )
                                      )
            Defendants.      )
                                      )

MEMORANDUM AND ORDER
March 22, 2012

    Alison Zea ("Zea") filed suit in Massachusetts Superior

Court, Suffolk County, against JPMorgan Chase Bank ("Chase") and

Meliora Holding Corporation ("Meliora") for breach of contract,

declaratory judgment, and violations of Massachusetts General

Laws chapter 93A.  Defendants properly removed the suit to this

court, and have now filed a motion for summary judgment.  For her

part, Zea moved for partial summary judgment on a counterclaim

made by Meliora.  For the following reasons, I (1) grant

defendants' motion for summary judgment (Dkt. No. 34); and (2)

deny Zea's motion for partial summary judgment on Meliora's

counterclaim (Dkt. No. 36).

**I.  BACKGROUND**

A.  Parties

    Alison Zea ("Zea") is a resident of Naples, Florida, and is

the owner and developer of real property located at 1 Edmunds

Road in Wellesley, Massachusetts.  Since 1995, Zea has been a
real estate developer for approximately ten projects.

JPMorgan Chase Bank, N.A. ("Chase") is a national
association with headquarters at 111 Polaris Parkway in Columbus,
Ohio.  Meliora Holding Corporation ("Meliora") is a Delaware
corporation with a principal place of business at 277 Park Avenue
in New York, New York; it is a wholly owned subsidiary of Chase.

B.   Facts

1.   *Chase's Loans to American Home Mortgage Corporation*

From 2006 to May 2007, American Home Mortgage Corporation
("AHM") and Chase entered into a series of senior secured credit
agreements (the "Warehouse Loans") for warehousing AHM's
construction/permanent and residential lot loans.  AHM used the
funding from the Warehouse Loans to fund mortgage loans it
originated.

Under § 8.2. of the Warehouse Loans, AHM was required to put
up the mortgages it was making as collateral for the loan by
delivering their paperwork to a custodian.  Pursuant to section
8.2 of the Warehouse Loans, when AHM requested funding under the
credit agreement the custodian would check to see that the value
of the loans he held was equal to or exceeded the amount AHM had
already borrowed.  If so, then AHM was allowed to borrow up to
the value of the existing loans in the custodian's possession.
Otherwise, AHM was required to pledge additional loans as
collateral before any further borrowing would be allowed.  *See*

*also* §§ 4.4 (detailing what happens if outstanding advances exceed borrowing base), 7.1 (granting Chase a security interest in the loans pledged as collateral).

In the event that AHM defaulted on the Warehouse Loans, specifically in this case by failing to pay its obligations and entering voluntary bankruptcy proceedings, *see* § 11.1, section 11.3 provided that Chase could do one of five things: "(1) Foreclose upon or otherwise enforce its security interest in and Lien on the Collateral" or on portions or elements thereof; "(2) Notify any or all Servicers (if any) of the Companies' Pledged Loans and, at the Agent's option and in its sole discretion, any or all Customers obligated under any or all items of Collateral, that the Collateral has been assigned to the Agent and that all payments thereon are to be made directly to the Agent or such other Person as may be designated by the Agent . . . ."; "(3) Act, or contract with one or more third Persons to act, as Servicer of each item of Collateral requiring servicing and perform all obligations required in connection with any Servicing Agreements to which a Company is a party" for fees; "(4) Exercise all rights and remedies of a secured creditor under the UCC of the State of California, the State of Maryland, the State of New York and any other relevant State, including selling the interests of the Companies in the Collateral at public or private sale," or "(5) Proceed against the Companies, or either of them,

on the Senior Credit Notes or any of them with or without, at the Agent's election, first proceeding against the Collateral."

    *2.    AHM's Loan to Zea*

    On March 30, 2007, Zea purchased the property located at 1 Edmunds Road in Wellesley for $1,125,000.  The property contained a partially-completed house, which Zea intended to renovate.  In order to pay for the property and the renovations, Zea obtained a $2,212,500 adjustable rate note from AHM on April 6, 2007.  The note, secured by a mortgage on the property, required that Zea make monthly payments on the first of the month beginning February 1, 2008.  A Construction Loan Addendum amending the Note was also attached.  In that Addendum, AHM agreed to advance Zea funds for the renovation project while she made only interest payments.  An allonge to the Note was attached with the purported signature of the Senior Vice President of AHM, Andrew Valentine.

    On the same day that the Note and Addendum were executed, Zea entered into a construction loan agreement with AHM.  Section 1.05 of the construction loan agreement governed how advances would be paid to Zea.  That section stated that as long as no "Event of Default" had occurred, AHM would advance proceeds of the loan no more frequently than once per month "as, in the opinion of [AHM], funds are needed by [Zea] for the payment of the costs ("Project Costs") of acquiring, constructing and equipping the Project, as reflected in the construction budget . . . ."

An "Event of Default" was defined in section 4.01 of the construction loan agreement to include, in relevant part, "(a) if [Zea] fails to pay [AHM] when due the principal or interest on the Loan or any other sum due under this agreement . . . [or] (c) if [Zea] fails to comply with any of the provisions of this agreement . . . or any of the other Loan Documents or if any other default or event of default occurs thereunder."  If an "Event of Default" occurred, under Section 4.02 AHM was entitled to "(a) refuse to make any further Advances; . . . (c) declare the Note in default and subject to foreclosure and foreclose the Security Instrument by suit in equity or under power of sale and foreclose any other of the Security Documents . . . ."

Section 1.05 of the Agreement further specified that advances would only be paid after an inspection by an AHM-selected inspector was completed to AHM's satisfaction "showing that the percentage of completion of the construction of the Project will equal or exceed the percentage of total Loan proceeds disbursed after taking into account the requested Advance."  Finally, section 1.01(l) provided that AHM was entitled to hold back ten percent of the total value of the note until all of the conditions in section 3.14 were met. Specifically, Section 3.14 provides that: "Unless and until [Zea] has completely satisfied and fulfilled all of the conditions and requirements of this Section 3.14, [AHM] shall have no duty or obligation to disburse the Holdback Amount [specified in section

1.01(l)]." Those conditions included the completion of construction; and delivery of a final survey, a final appraisal indicating the value of the completed project, and a termite bond and tax survey.

3.  *Zea's Renovation*

During Zea's renovation, AHM paid out $2,038,040.50 of the $2,212,500 note, or 92.11% of the total amount of the Note.  On December 6, 2007, Zea requested the final disbursement under the Note of $174,459.50.  Pursuant to section 1.05 of the construction loan agreement, AHM hired Trinity Inspection Services to inspect the property.  Trinity's inspection revealed that as of December 9, 2007, only 61% of the project was completed.  AHM thereupon denied Zea's request and the construction project was never completed.

4.  *AHM's Bankruptcy*

AHM defaulted on the Warehouse Loans in August 2007 and entered Chapter 11 bankruptcy on August 6, 2007.  Neither party disputes that Zea's construction loan was one of the loans pledged by AHM to Chase as collateral.

Shortly after AHM entered Chapter 11 bankruptcy, Chase and AHM entered a joint stipulation with the bankruptcy court.  That stipulation allowed Chase to give additional funds to AHM "for the purpose of completing the construction or improvement of the Construction Properties, which . . . shall be held in trust for the benefit of [Chase]."  The stipulation was "without prejudice

6

to the rights of [Chase] . . . with respect to the Warehouse
Facility Collateral, including, without limitation, [Chase]'s
right to seek relief from the automatic stay . . . ."  AHM and
Chase also agreed in the stipulation that "[n]othing contained
herein shall modify, terminate or transfer or be deemed to
effectuate a modification, termination or transfer of [AHM's]
servicing business, i.e. [AHM's] rights to service or administer
any mortgage loans and all related activities.  This Stipulation
is without prejudice to any party's rights regarding the
ownership of the servicing of the Construction/Permanent Loans."
The bankruptcy judge accepted AHM's and Chase's stipulation.

On November 21, 2007, Chase moved for relief from the
automatic stay to foreclose on the construction/permanent loans.
Chase argued that AHM had no equity in the underlying collateral
(the construction/permanent loans) and the loans were not
necessary to AHM's reorganization, as required for a relief from
stay to issue under section 362(d)(2) of the Bankruptcy Code.

On January 4, 2008, the Bankruptcy Court granted Chase's
motion.  The Court's order stated that:

1.    The automatic stay is hereby modified, lifted and
      terminated to permit [Chase], in its capacity as
      Administrative Agent and Lender, to exercise any
      and all of the rights and remedies under the
      Warehouse Facility Papers and applicable law that
      [Chase] may have with respect to the
      Construction/Permanent Loans (including without
      limitation with respect to the underlying C/P Loan
      Collateral).
2.    This Order shall not prejudice, impair or
      otherwise affect any rights, arguments or claims

        of any kind that [Chase] may have with respect to the remaining Warehouse Facility Collateral and/or any other property of the Debtors' estates under, among other things, the Warehouse Facility Papers, any other agreements among [Chase], its Affiliates, [AHM] and/or their Affiliates, and applicable law, including without limitation the right to seek further relief from the automatic stay from this Court.

3.     Nothing in this Order shall be deemed to be an admission of liability or waiver of claims of [AHM or Chase] with respect to any claim or cause of action arising under or related to the Warehouse Facility Papers. [Chase] reserves any and all rights to bring an adversary proceeding or seek other relief to enforce and protect its rights under the Warehouse Facility Papers on any and all bases. [AHM] reserv[es] any and all rights to contest any and all motions, claims or causes of action arising from or related to the Warehouse Facility Papers on any and all bases.

4.     [AHM] shall cooperate with [Chase] to transfer servicing rights and loan files and otherwise effectuate this Order to the extent commercially practicable in light of [AHM's] status as debtors in possession.

5.    *Transfer of Zea's Loan to Chase and Meliora*

On February 15, 2008, Chase gave notice to AHM to transfer possession of a number of identified Construction/Permanent Loans to its affiliate, Meliora Holding Corp.  Chase's letter noted that it would "service the Transferred Loans pursuant to arrangements between Meliora and [Chase], and the Companies are hereby directed to transfer servicing of the Transferred Loans to [Chase]."

On March 12, Chase provided notice to Zea that her "Mortgage Loan has been transferred from American Home Mortgage Corporation

to Meliora Corporation. [Chase] has assumed responsibility for
the servicing of your loan for Meliora Corp."

C.    Proceedings

        Zea filed her complaint on May 3, 2010 in the Superior Court
of Suffolk County, Massachusetts claiming breach of contract and
a violation of Massachusetts General Laws chapter 93A.
Defendants removed her suit to federal court under 28 U.S.C. §§
1441 and 1446 on June 17, 2010.  On October 17, 2011, with this
court's permission, Meliora filed its First Amended Counterclaim
alleging that Zea breached her contract by failing to make her
required monthly payments on the Note.  Defendants then filed a
motion for summary judgment on November 18, 2011.  On the same
day, Zea filed a motion for partial summary judgment on Meliora's
counterclaim for breach of contract, alleging that Meliora was
not the holder of the Note or a non-holder in possession with the
rights of a holder, and therefore could not sue Zea.

## II.   STANDARD OF REVIEW

        A movant is entitled to summary judgment when "the movant
shows that there is no genuine dispute as to any material fact
and the movant is entitled to judgment as a matter of law."  Fed.
R. Civ. P. 56(a).  "A dispute is genuine if the evidence about
the fact is such that a reasonable jury could resolve the point
in the favor of the non-moving party," and "[a] fact is material
if it has the potential of determining the outcome of the
litigation." *Farmers Ins. Exch. v. RNK, Inc.*, 632 F.3d 777, 782

(1st Cir. 2011) (citation omitted).  However, "conclusory allegations, improbable inferences, and unsupported speculation" are insufficient to create a genuine issue of material fact to survive summary judgment.  *Sullivan v. City of Springfield*, 561 F.3d 7, 14 (1st Cir. 2009) (quotation and citation omitted).  I "view the facts in the light most favorable to the party opposing summary judgment."  *Rivera-Colón v. Mills,* 635 F.3d 9, 10 (1st Cir. 2011).

### III.  DISCUSSION

A.   Zea's Motion for Partial Summary Judgment

Zea moved for partial summary judgment against Meliora and claimed that as a matter of law Meliora could not establish that it was a holder of the Note or a non-holder in possession with the rights of a holder.  Meliora opposed, arguing in the alternative that either it is a non-holder in possession with the rights of a holder, or that there is a genuine issue of material fact as to whether Meliora is the holder of the Note.

On the record before me, it is clear that Meliora is a non-holder in possession with the rights of a holder.  A party becomes a non-holder in possession with the rights of a holder if the Note is "transferred" to that party as defined by Massachusetts General Laws chapter 106 section 3-203(a).  *See* Mass. Gen. Laws ch. 106 §§ 3-203, 3-301.  "An instrument is transferred when it is delivered by a person other than its issuer for the purpose of giving to the person receiving delivery

10

the right to enforce the instrument." Mass. Gen. Laws ch. 106 § 3-203(a). Thus, under the statute, a party claiming to be a non-holder in possession with rights of a holder must show two things: first, that physical delivery of the Note was made, and second, that the intent of the transferor was to give the party "the right to enforce the instrument." If both elements are met, the transfer "vests in the transferee any right of the transferor to enforce the instrument." *Id.* § 3-203(b).

Zea argues that Meliora cannot show that AHM transferred the Note for the purpose of giving Meliora "the right to enforce the instrument." Zea claims that the bankruptcy court's order granting Chase's motion for relief from the stay did not effect a transfer of the right to enforce the Note to Meliora, but instead was a transfer of only so-called "loan servicing rights." In order to support this claim, Zea misquotes the bankruptcy court's order at page 8 of her memorandum in support of her motion for partial summary judgment. That misquotation is as follows:

> The order ultimately adopted by the bankruptcy court, consistent with American Home's position, specifically reserved to American Home "any and all rights to contest any and all motions, claims or causes of action arising from or related to the [underlying collateral] on any and all bases." The order instead simply contemplated that American Home "*transfer servicing rights and loan files* and otherwise effectuate this Order to the extent commercially practicable in light of the Debtors status as debtors in possession."

(alterations and emphasis in original).

The bankruptcy court's order, however, gave AHM the right to "contest any and all motions, claims or causes of action arising from or related to *the Warehouse Facility Papers*," not the "[underlying collateral]" as Zea's edited quotation states. Although Zea argues that "the order ultimately entered by the bankruptcy court did *not* grant permission for Chase to foreclose its lien or security interest and did *not* require American Home to assign *in toto* loans to Chase," the plain language of the bankruptcy court's order states otherwise:

> The automatic stay is hereby modified, lifted and
> terminated to permit [Chase], in its capacity as
> Administrative Agent and Lender, *to exercise any and*
> *all of the rights and remedies under the Warehouse*
> *Facility Papers* and applicable law that [Chase] may
> have with respect to the Construction/Permanent Loans
> (including without limitation with respect to the
> underlying C/P Loan Collateral).

(emphasis added).  The bankruptcy court then ordered AHM to "transfer servicing rights and loan files and otherwise effectuate this Order to the extent commercially practicable."

As noted above, the Warehouse Loans provided in section 11.3(a) five remedies in the case of an Event of Default.  Two remedies listed gave Chase the power to "[f]oreclose upon or otherwise enforce its security interest in . . . the Collateral" and to "[n]otify any or all Servicers (if any) of [AHM's] Pledged Loans and . . . any or all Customers obligated under any or all items of Collateral, that the Collateral has been assigned to the Agent and that all payments thereon are to be made directly to

12

the Agent . . . ."  §§ 11.3(c)(1) & (2).  To effectuate these

powers, AHM was ordered to "cooperate with [Chase] to transfer

servicing rights and loan files and otherwise effectuate this

Order to the extent commercially practicable in light of [AHM's]

status as debtors in possession."

   AHM transferred the Note to Meliora, Chase's agent, sometime

between February and March, 2008.  The letter from Chase to AHM

about the transfer of the Note identified the Bankruptcy Court

Order and requested that AHM "transfer possession of the

Construction/Permanent Loans identified on the attached trial

balance . . . to JPMorgan's affiliate, Meliora Holding Corp. . .

. JPMorgan will service the Transferred Loans pursuant to

arrangements between Meliora and JPMorgan, and [AHM is] hereby

directed to transfer servicing of the Transferred Loans to

JPMorgan."

   The Servicing Arrangement between Chase and Meliora gave

Meliora complete control over the Construction/Permanent Loans,

in effect creating an agency relationship.  The Servicing

Arrangement required that Meliora "shall take all actions and

directions with regards to the Construction to Permanent Loans,"

and gave Meliora the ability to fund additional draws under each

Construction/Permanent Loan as Meliora "deems necessary in its

discretion to complete the construction, improve or repair of the

homes."  Meliora agreed to collect payments from mortgagors and

deposit them into separate accounts maintained by Meliora for
each Construction/Permanent Loan.  *See generally* Adam J. Levitin
& Tara Twomey, *Mortgage Servicing*, 28.1 YALE J. REG. 1 (2011)
(describing the traditional duties and functions of mortgage
servicers).

The bankruptcy court's order and the subsequent physical
transfer of the Note to Meliora were therefore sufficient under
section 3-203(a) to make Meliora a non-holder in possession with
the rights of a holder.  The order permitted Chase to "exercise
any and all of the rights and remedies under the Warehouse
Facility Papers," which allowed Chase to "enforce its security
interest" and notify the mortgagors that their payments should be
made directly to Chase.  AHM was ordered to "cooperate with
[Chase] to transfer servicing rights and loan files and otherwise
effectuate this Order to the extent commercially practicable in
light of [AHM's] status as debtors in possession."  In doing so,
AHM "transferred" the Note to Meliora because it physically
delivered the Note to Meliora with the purpose that Meliora would
have the right to enforce the instrument as ordered by the
bankruptcy court.[1]  Mass. Gen. Laws ch. 106 § 3-203(a).  Thus,

---

[1]  Zea argues that a letter from Chase's counsel admitted that
"the bankruptcy court granted [Chase]'s motion for relief from
the automatic stay for the limited purpose of transferring the
loan servicing rights to [Chase] . . . At no time, however, was
there ever a formal assignment to [Chase] of all rights and
liabilities in connection with the loans . . . ."  However, I
need not inquire into extrinsic evidence of the parties'

Meliora is a non-holder in possession with the rights of a holder. *See In re Neals*, 459 B.R. 612, 618-19 (Bankr. D.S.C. 2011) (finding that "a loan servicer responsible for collecting payments on and enforcing the terms of the Note on behalf" of a bank was a non-holder in possession with the rights of a holder). Consequently, I will DENY Zea's motion for partial summary judgment[2]

B.    Defendants' Motion for Summary Judgment

Zea's original complaint in the Suffolk County Superior Court charged AHM with breach of contract for failure to fund Zea's final construction draw request.  She also claimed that defendants violated Massachusetts General Laws chapter 93A. After Meliora removed the case to federal court, it filed a counterclaim that Zea was in default on the Note.  Chase and

---

understanding of the bankruptcy court's order or, as Zea suggests, the parties' arguments to the bankruptcy court as somehow instructing how that court's order should be understood. Clear court orders are to be taken according to their unambiguous terms.  *Travelers Indem. Co. v. Bailey*, 129 S. Ct. 2195, 2205 (2009) ("If it is black-letter law that the terms of an unambiguous private contract must be enforced irrespective of the parties' subjective intent, it is all the clearer that a court should enforce a court order, a public governmental act, according to its unambiguous terms." (citation omitted)).  The bankruptcy court's order was unambiguous, thus I need not consider Zea's extrinsic evidence.

[2]   Zea also argues that nothing in the record shows that Meliora is the holder of the Note after a valid negotiation, because she challenges the authenticity of the signature on the allonge purporting to assign the Note to Meliora.  However, I need not address this argument, because as noted above, Meliora is at least a non-holder in possession with the rights of a holder.

Meliora then jointly moved for summary judgment in their favor on both Zea's complaint and Meliora's counterclaim.

> 1.   *Summary Judgment on Zea's Breach of Contract Claim*

Zea's complaint alleges that AHM breached the construction loan agreement because AHM failed to fund Zea's last draw request in December 2007.   Defendants argue that under the unambiguous terms of the construction loan, AHM did not commit a breach by declining to fund Zea's final draw request.

Zea's claim that AHM breached the construction loan agreement fails for two reasons.   First, the construction loan in § 1.05 provided that AHM could require an inspection "showing that the percentage of completion of the construction of the Project will equal or exceed the percentage of total Loan proceeds disbursed after taking into account the requested Advance" before allowing any draws to be disbursed to Zea.   After Zea requested the final draw, AHM had its designated inspector report on the percentage of completion of the construction project, pursuant to section 1.05.   The inspector concluded that at the time of his inspection, the project was only 61% complete, but 92% of the total loan amount had been paid out.[3]   Because Zea

---

[3]   Even if, as Zea argues, "total Loan proceeds" is ambiguous, that is insufficient to survive Defendants' motion for summary judgment because under any possible definition of the term, substantially more than 61% of the proceeds had been paid out. For example, even if total Loan proceeds meant only the total amount of the loan designated for construction, more than 61% of the proceeds had been disbursed.   The loan was for $2,212,500,

Case 1:10-cv-11029-DPW   Document 56   Filed 03/22/12   Page 17 of 20

could not show that the project was at least as completed as the percentage of the total Loan proceeds that had been drawn, section 1.05 of the contract entitled AHM to deny her draw. Thus, AHM was not in breach of the construction loan agreement and Zea's claim fails.

Section 1.01(l), the "Holdback provision," provides a second reason why Zea's claim fails. That section of the construction loan provided that AHM was entitled to hold back ten percent of the total value of the note until all of the conditions in section 3.14 were met. *See also* § 3.14 ("Unless and until [Zea] has completely satisfied and fulfilled all of the conditions and requirements of this Section 3.14, [AHM] shall have no duty or obligation to disburse the Holdback Amount [specified in section 1.01(l)]."). Section 3.14 required Zea to furnish *inter alia* a final as-built survey, a fully paid original hazard insurance policy, a certificate of occupancy, if applicable, and a "final appraisal from an independent appraiser . . . indicating the value of the Project as completed with walks/drives and landscaping to be at least equal to the Appraised Value . . . ."

---

and $1,125,000 was for the purchase of the property, leaving $1,087,500 for construction. As of the time of Zea's last draw request, she had already drawn $913,040.50 for construction costs ($2,038,040.50 in total draws minus the $1,125,000 for the purchase price of the property). Thus, even if total Loan proceeds meant only that portion of the loan attributable to construction costs, Zea had already drawn 83.95% of the total Loan proceeds at the time of her last draw request.

§ 3.14.  Zea did not provide any documents indicating that the projected had been completed; indeed, the entire basis of her claim is that the project was never completed.

As of Zea's final draw request, it is undisputed that AHM had disbursed $2,038,040.50 of the $2,212,500 loan, or approximately 92% of the total value of the Note.  Zea's final request was for $174,459.50, the exact remainder of the available funds under the Note.  Because the project was not completed and it is undisputed that Zea did not furnish AHM with the required surveys and inspections under section 3.14, AHM was not required to disburse the last $174,459.50 draw.  Thus, Zea's claim that AHM breached the construction loan agreement fails, and summary judgment is appropriate in Defendants' favor.[4]

> 2.  *Summary Judgment on Zea's 93A Claim*

Zea's complaint also claims Defendants violated Massachusetts General Laws chapter 93A, but it is unclear whether her claim is premised on AHM's alleged contract violation or

---

[4]  Zea attempts to argue that the holdback provision is ambiguous, and therefore that summary judgment is inappropriate, because it is "silent on the precise manner by which the holdback amount would be withheld, if at all, from the construction draws made by AHM to Zea."  There is nothing ambiguous about the holdback provision's language.  *See Suffolk Const. Co. Inc. v. Illinois Union Ins. Co.*, 951 N.E.2d 944, 948 (Mass. App. Ct. 2011) ("A term is ambiguous only if it is susceptible of more than one meaning and if reasonably intelligent persons would differ over the proper meaning.").

Chase and Meliora's demand on the Note.  Regardless, Zea's 93A claim fails.

If Zea's 93A claim is based on the alleged contract violation, it fails because neither defendants nor AHM breached the construction loan agreement, and nothing in the record supports a finding that any action on the part of either defendant or AHM was unfair or deceptive.  If Zea's 93A claim is based on defendants' demand for payment of the Note, it fails because a "good faith dispute as to whether money is owed, or performance of some kind is due, is not the stuff of which a c. 93A claim is made." *Northern Sec. Ins. Co. v. R.H. Realty Trust*, 941 N.E.2d 688, 692 (Mass. App. Ct. 2011) (quoting *Duclersaint v. Fed. Nat'l Mort. Ass'n*, 427 Mass. 809, 814 (1998)).  Thus, under either scenario, Zea's 93A claim fails, and summary judgment is appropriate for defendants.

   3.   *Summary Judgment on Meliora's Counterclaim*

Zea admits that she signed the Note obligating her to repay the $2,212,500 Note.  She also admits that she has not made the required monthly payments on the Note.  Under section 4.01 of the construction loan agreement, Zea's failure to pay the principal or interest on the Note when due is an Event of Default entitling AHM to declare the Note in default and foreclose on the mortgage. Because, as noted above, Meliora is a non-holder in possession of the Note with the rights of a holder, Meliora is entitled to

foreclose on the mortgage.  Thus, Meliora is entitled to summary judgment on its claim that Zea is liable for the $2,038,040.50 principal balance plus interest on the Note.

## IV.  CONCLUSION

For the reason set forth above, I GRANT defendants' motion for summary judgment (Dkt. No. 34); and DENY Zea's motion for partial summary judgment on Meliora's counterclaim (Dkt. No. 36).


*/s/ Douglas P. Woodlock*
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE